Slip Op. 17-24

UNITED STATES COURT OF INTERNATIONAL TRADE

SHANGHAI WELLS HANGER CO., LTD.,

Plaintiff,

v.

UNITED STATES,

Defendant.

Before: Leo M. Gordon, Judge

Consol. Court No. 15-00103

**OPINION and ORDER**

[Commerce's final results remanded.]

Dated: March 2, 2017

Jonathan M. Freed, Trade Pacific PLLC of Washington, DC, for Plaintiffs Shanghai Wells Hanger Co., Ltd., Hong Kong Wells Ltd., Hong Kong Wells Ltd. (USA), and Fabriclean Supply, Inc.

Courtney D. Enlow, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, DC, for Defendant United States. With her on the brief were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, Reginald T. Blades, Jr., Assistant Director. Of counsel on the brief was Henry J. Loyer, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance of Washington, DC.

Gordon, Judge: This action involves the fifth administrative review conducted by

the U.S. Department of Commerce ("Commerce") of the antidumping duty order covering

steel wire garment hangers from the People's Republic of China ("PRC"). See Steel Wire

Garment Hangers from the PRC, 79 Fed. Reg. 65,616 (Dep't Commerce Nov. 5, 2014)

(prelim. results admin. rev.) ("Preliminary Results") and accompanying Decision Mem. for

the Prelim. Results of the 2012-2013 Antidumping Duty Admin. Rev., A–570–918,

(Oct. 31, 2014), PD 178[1] at bar code 3238876-01, ECF No. 21 ("Preliminary Decision Memo"); see also Steel Wire Garment Hangers from the PRC, 80 Fed. Reg. 13,332 (Dep't Commerce Mar. 13, 2015) (final results admin. rev.) ("Final Results") and accompanying Issues and Decision Mem. for Steel Wire Garment Hangers from the PRC, A–570–918, (Mar. 6, 2015), PD 197 at bar code 32631490-01, ECF No. 21 ("Final Decision Memo").

Before the court is the USCIT Rule 56.2 motion for judgment on the agency record of Plaintiffs Shanghai Wells Hanger Co., Ltd., Hong Kong Wells Ltd., Hong Kong Wells Ltd. (USA), and Fabriclean Supply, Inc. (collectively, "Plaintiffs" or "Shanghai Wells"). See Rule 56.2 Mem. Supp. Mot. J. Agency R. of Pls. Shanghai Wells Hanger Co., Ltd., Hong Kong Wells Ltd., Hong Kong Wells Ltd. (USA), and Fabriclean Supply, Inc., ECF No. 41 ("Pls.' Br."); see also Def.'s Mem. Opp'n Pls.' Rule 56.2 Mot. J. Agency R., ECF No. 49 ("Def.'s Opp'n"); Pls.' Reply Def.'s Opp'n, ECF No. 54 ("Pls.' Reply"). The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012),[2] and 28 U.S.C. § 1581(c) (2012).

Plaintiffs challenge (1) Commerce's selection of Thailand as the primary surrogate country, (2) Commerce's valuation of Shanghai Wells' labor factor of production ("FOP"); (3) Commerce's calculation of surrogate financial ratios, (4) Commerce's valuation of

---

[1] "PD" refers to a document contained in the public administrative record.
[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

Shanghai Wells' corrugated paperboard input; and (5) Commerce's valuation of Shanghai Wells' brokerage and handling costs. For the reasons that follow, the court remands this matter to Commerce to reconsider its surrogate country selection. The court reserves judgment on the remaining issues, which may become moot.

## I. Standard of Review

The court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006); see also Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). Fundamentally, though, "substantial evidence" is best

understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr.,

<u>Administrative Law and Practice</u> § 9.24[1] (3d ed. 2016). Therefore, when addressing a

substantial evidence issue raised by a party, the court analyzes whether the challenged

agency action "was reasonable given the circumstances presented by the whole record."

8A <u>West's Fed. Forms</u>, National Courts § 3.6 (5th ed. 2016).

## II. Discussion

In an antidumping duty administrative review, Commerce determines whether

subject merchandise is being, or is likely to be, sold at less than fair value in the United

States by comparing the export price and the normal value of the merchandise. 19 U.S.C.

§§ 1675(a)(2)(A), 1677b(a). In the non-market economy ("NME") context, Commerce

calculates normal value using data from surrogate countries to value respondents' FOPs.

19 U.S.C. § 1677b(c)(1)(B). Commerce must use the "best available information" in

selecting surrogate data from "one or more" surrogate market economy countries.

19 U.S.C. § 1677b(c)(1)(B), (4). The surrogate data must "to the extent possible" be from

a market economy country or countries that are (1) "at a level of economic development

comparable to that of the [NME] country" and (2) "significant producers of comparable

merchandise." 19 U.S.C. § 1677b(c)(4). Commerce has a stated regulatory preference to

"normally . . . value all factors in a single surrogate country." 19 C.F.R. § 351.408(c)(2)

(2013). Commerce utilizes a four-step process to select a surrogate country:

> (1) the Office of Policy . . . assembles a list of potential surrogate countries
> that are at a comparable level of economic development to the NME
> country; (2) Commerce identifies countries from the list with producers of
> comparable merchandise; (3) Commerce determines whether any of the

              countries which produce comparable merchandise are significant producers
              of that comparable merchandise; and (4) if more than one country satisfies
              steps (1)–(3), Commerce will select the country with the best factors data.

Vinh Hoan Corp. v. United States, 39 CIT ___, ___, 49 F. Supp. 3d 1285, 1292 (2015)

(internal quotation marks omitted) (quoting Import Admin., U.S. Dep't of Commerce,

Non-Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004)

("Policy Bulletin"), available at http://enforcement.trade.gov/policy/bull04–1.html

(last visited this date)). See also 19 C.F.R. § 351.408(c)(2); Policy Bulletin at 4 ("[D]ata

quality is a critical consideration affecting surrogate country selection."). When choosing

the "best available" surrogate data on the record, Commerce, to the extent practicable,

seeks data that are publicly available, product-specific, reflective of a broad market

average, and contemporaneous with the period of review. Qingdao Sea–Line Trading Co.

v. United States, 766 F.3d 1378, 1386 (Fed. Cir. 2014).

        Here, Commerce issued a non-exhaustive list of potential surrogate countries.

See Letter Regarding Deadlines for Surrogate Country and Surrogate Value Comments,

Attach. 1, PD 14 at bar code 3175386-01 (Jan. 23, 2014). Commerce identified six

potential surrogate countries that were at a level of economic development comparable

to the PRC and were significant producers of comparable merchandise. Id. Commerce's

surrogate country determination therefore turned on the issue of data quality, i.e., which

country had the best available data. The choice soon narrowed from among six to

between two, Thailand and the Philippines. Commerce appeared to address the relative

quality of Thai and Philippine import data, labor data, and financial statements to

determine which country provided the "best available" information. See Final Decision Memo at 12 (Comment 2, "Selection of Surrogate Country"). For import and labor data, Commerce determined that Thailand had the better quality data. Id. at 10-11.

For the financial statements, however, Commerce did not compare the available Philippine and Thai statements. Commerce simply concluded that the Thai financial statements were "usable" and relied on a regulatory preference to value all factors of production in a single country. Id. at 15 ("[B]ecause we have useable financial statements from Thailand, the primary surrogate country in this review, and because it is the Department's preference to stay within the primary surrogate country, we are not considering the Philippine financial statements.").

The problem here is straightforward.  Plaintiffs argue that Commerce never compared the Philippine and Thai financial statements to determine which was best, and that by sidestepping this comparison (one Commerce made for import and labor data), Commerce failed to apply its surrogate country selection criteria reasonably.  See Pls.' Br. 13-14. The court agrees.  Implicit in Commerce's "finding" that the Thai financial statements are merely "usable" is a tacit concession that the Philippine financial statements are actually superior, a fact borne out by the record.  Plaintiffs explain that the four Philippine surrogate companies "produced comparable merchandise by drawing wire rod to wire and making various wire products," id. at 13-14, which closely resembles Shanghai Wells' production process. Id. at 21. Plaintiffs contrast the Thai financial statements, noting that the two of the three Thai companies – Sahasilp and Monkgol

Fasteners – did not produce comparable merchandise and did not draw wire from wire rod in the production process. Id. 21-22. According to its public financial statements, Sahasilp manufactured and sold "all kinds of nuts, rivets, screws, pressed components of shoe[] decoration and related accessories," and its web site described the following product categories: "Furniture Part, Automotive Part, Machines, Springs, Standard Stainless Steel Chemical Elements, and Cold Forming Carbon Steel," which, Plaintiffs note, are not comparable to garment hangers. Id. 21 (quoting M&B Metal Prods. Co.'s Surrogate Value Submission, Ex. 1, P.D. 170 at barcode 3232295-01 (Oct. 1, 2014) & Ex. 3, P.D. 172 at barcode 3232295-03 (Oct. 1, 2014)). Plaintiffs also note that the record shows that Mongkol Fastener produced fasteners for "various applications such as construction part, machinery part, automobile part, electrical appliance part, [and] medical implant part," using over fifteen types of machinery, none of which included wire drawing machinery. Id. 22 ("Nothing in this record indicated that Mongkol Fastener engage[d] in drawing wire from steel wire rod, but the record contains abundant evidence regarding its forging and die-casting operations for manufactured products dissimilar to steel wire garment hangers."). Defendant and Defendant-Intervenor do not offer a compelling or persuasive response to Plaintiffs' analysis of the record.

Given the importance of wire drawing for the production of the subject merchandise, and the relative weakness of the Thai companies on this characteristic when compared to those of the Philippines, the court cannot understand how a reasonable mind would conclude that the Thai financial statements are superior to the

Philippine financial statements. Rather than acknowledge the apparent superiority of the Philippine financial statements, and incorporate that fact into its surrogate country selection analysis, Commerce instead settled for "usable" Thai statements because it preferred to "stay within the primary surrogate country." Id. at 15. That though puts the proverbial cart before the horse. Commerce may not select Thailand as the surrogate country by ignoring a step in its process. It must first reasonably evaluate the available data sets, which includes an acknowledgment that on this record a reasonable mind would not select the Thai financial statements as better than the Philippine statements.

Be aware, however, that this does not mean that the Philippines must, and Thailand cannot, be the surrogate country. It simply means that Commerce's process of selecting Thailand was unreasonable. The court expresses no opinion on whether either country may constitute a reasonable choice on this administrative record. It may be that the import and labor data carry more weight in the margin calculation for wire hangers. It may be that the financial statements are the relatively more important factor. It may even be that this is a case where sourcing surrogate data from more than one country (despite the attendant headaches and difficulty that entails) yields the most accurate dumping margin. Commerce and the parties will have to sort that out on remand.

### III. Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that the <u>Final Results</u> are remanded to Commerce to reconsider its selection of Thailand as the primary surrogate country; it is further

**ORDERED** that Commerce shall file its remand results on or before May 2, 2017; and it is further

**ORDERED** that, if applicable, the parties shall file a proposed scheduling order with page limits for comments on the remand results no later than seven days after Commerce files its remand results with the court.


                                        /s/ Leo M. Gordon
                                       Judge Leo M. Gordon


Dated: March 2, 2017
       New York, NY